RECEIVED 07/25/2018 12:07PM 330290044
07/26/2018 13:26 V404252728 KNOXCPA LARRY D SHRISER PAGE 06

## Oil and Gas Lease


COPY

THIS OIL AND GAS LEASE (hereinafter, "Lease") made and entered into on this **10th** day of **February** 2012, by and between **Elaine Grissom, Individually and as Attorney-in-fact for James Grissom, her husband,** whose address is **55988 Seneca Lake Rd., Quaker City, OH 43773** (hereinafter, "Lessor") (collectively if there is more than one) and **ANTERO RESOURCES APPALACHIAN CORPORATION**, whose address is 1625 17th Street, Denver, Colorado 80202 (hereinafter, "Lessee").

### GRANT OF LEASE

1) That the Lessor, for and in consideration of paid-up annual rentals commonly known as a signing cash bonus of Five Thousand Nine Hundred Dollars ($5,900.00) for each net mineral acre covered by this Lease, paid by the Lessee (the "Bonus"), and of the royalties as provided, the covenants and agreements contained herein does hereby exclusively grant, convey, lease and let unto the Lessee, all of the oil, gas, liquid and gaseous hydrocarbons and their constituents and by-products thereof, formations below the base of the Ohio Shale formation (top of the Java formation) at a depth of approximately 4195 feet, as seen in the W J Lydic Inc., Rosenberg #3 Well (API Number 3111122656000) located in Section 11, Malaga Township, Monroe County, Ohio, to a depth of two hundred feet (200') below the base of the Utica (Point Pleasant) Shale, in and under the Leased Premises, for the exclusive right to drill, explore, conduct seismic prospect, operate for, produce, remove and market oil, gas, hydrocarbons and their constituents and by-products therefrom, and to otherwise conduct all such secondary, enhanced, or tertiary operations as may be required in the opinion of the Lessee and the right to transport, use and maintain, by pipelines or otherwise across and through said lands, oil, gas and their constituents and products thereof, including water, brine or any other fluid or substances, only from the below defined Leased Premises and from other lands unitized or pooled therewith, and the right to enter thereon at all times and to occupy and use so much of the leased Premises as is necessary or convenient for only the aforesaid purposes. Lessee shall always act as a reasonable prudent operator exercising good faith in all of its activities with the Lessor. The above grant excludes any right to store gas, or inject any fluids or brine of any kind into the Leased Premises for any purpose of storage or disposal. The Lessor, in his sole discretion at any present or future date, shall have the right to lease other strata to any Lessee of his choosing.

### DESCRIPTION OF THE LAND INCLUDED IN THIS LEASE

2) The land included in this Lease, herein called the "Leased Premises" is identified as follows:

| County | Township | Sec/Twp/Range | Acreage | Tax Number |
|--------|----------|---------------|---------|------------|
| Noble  | Beaver   | 21/8/7        | 96      | 01-00-21349-000 |
| Noble  | Beaver   | 21/8/7        | 75      | 01-00-50112-000 |

### LIMITATIONS ON GRANT OF LEASE

3) Despite anything contained herein to the contrary, Lessor reserves all oil and gas and other mineral interests from the surface of the leased premises to the bottom of the Ohio Shale. Lessor also owns and reserves any and all formations two hundred feet (200') below the Utica Shale, other than such rights necessary for Lessee to drill through such reserved portions to access the formations leased herein. If Lessee does not place into production any oil, gas, liquid and gaseous hydrocarbons and their constituents and by-products, leased herein, excluding the Utica, within ten years from the commencement of the lease, all rights of the Lessee therein shall revert back to the Lessor. In the event Lessor chooses to grant any remaining rights reserved by Lessor under the immediate preceding sentence to any party other than the Lessee, then before any such grant Lessor shall provide Lessee with a writing setting forth all terms and conditions of such other grant, or a true copy of any lease or other document reflecting such grant. Lessee shall be afforded a period of at least thirty (30) calendar days following receipt of such written notice, during which time Lessee may elect to exercise this first right of refusal to assume

2113049.4

PLAINTIFF'S EXHIBIT 1 — ALL-STATE LEGAL

the obligations or lessee or grantee under such other proposed grant on the same terms and conditions contained therein. Should Lessee so elect, Lessee shall notify Lessor in writing within such thirty (30) day period and submit therewith any up-front payments or other considerations described in such proposal, along with a signed lease or grant document accordingly. Should Lessor make such a lease or grant to a third party without first giving to Lessee herein, such lease or grant shall be void. Lessor reserves the right to construct any structure or other improvements at any location selected by Lessor on the leased premises. If Lessor commences construction prior to Lessee conducting operations on the leased premises, Lessee will not locate any equipment or improvement, to the extent provided in paragraph 23 unless otherwise agreed to in writing by the parties. Lessor reserves the right to continue or initiate any agricultural activities or activities associated with livestock on the leased premises. Lessor further reserves all rights not specifically granted to Lessee within this Lease.

## OIL AND GAS ONLY

4) This Lease covers only oil and gas. The term "oil and gas" means oil, gas, and other liquid and gaseous hydrocarbons produced through a well bore. Thus, this Lease does not include and there is hereby excepted and reserved unto Lessor all the sulfur, coal, lignite, uranium and other fissionable material, geothermal energy, base and precious metals, rock, stone, gravel, and any other mineral substances (excepting those described above) presently owned by Lessor in, under, or upon the Leased Premises, together with right of ingress and egress and use of the Leased Premises by Lessor or its lessees or assignees for the purpose of exploration for and production and marketing of materials and minerals reserved hereby; provided, however, Lessor's right to develop the reserved minerals shall not interfere with the rights herein granted to Lessee.

## NO STORAGE RIGHTS

5) Notwithstanding anything herein contained to the contrary, Lessee agrees the herein described leased premises shall not be used for the purpose of gas storage.

## NO DISPOSAL AND/OR INJECTION WELLS

6) Lessee shall not use the Leased Premises for the permanent disposal of anything drilled cuttings, residual wastes. No disposal or injection wells are permitted on the Leased Premises.

## NOTICE OF OPERATIONS AND AGENCY ACTIONS

7) Lessee shall give Lessor advanced written notice of the spud date, commencement and completion of drilling or other wellbore completion operations, temporary abandonment, and plugging and final abandonment of any well on the leased premises or in a drilling Unit which contains all or a portion of the leased premises. Such notice shall be provided or delivered to Lessor no less than thirty (30) business days prior to such an event. Lessee shall give Lessor written notice of any hearings or actions, whether by a governmental agency or a court, affecting the leased premises; such notice shall be provided or mailed to Lessor within five (5) business days following the date that Lessee learns the same.

## NO DELAY RENTAL

8) Lessor shall not receive any paid annual rentals since this is a paid-up in advance lease.

## TERMS

9)
   A) This lease shall continue in force and the rights granted hereunder shall be quietly enjoyed by the Lessee during the primary term of five (5) years from the date that Lessor signs the Lease and so much longer thereafter as oil or gas or this constituents are produced on the Leased Premises or land contiguously pooled or unitized herewith, in paying quantities or for as long as Lessee is conducting operations for oil and gas. In connection therewith, (a) a well shall be deemed to be producing in paying quantities if it is producing a profit over operating costs, without regard to any capital costs to drill or equip the well, or to deliver the oil or gas to market, and (b)

2

COPY

the Lessee shall be deemed to be conducting operations for oil and gas, or their constituents, if the Lessee is conducting operations as defined in paragraph 20. A well shall be deemed commenced upon the spudding of the well.

B) Lessee is hereby given the option to extend by renewal the Primary Term of this Lease for one additional three (3) year period. This option may be exercised by Lessee at any time up to one hundred eighty (180) calendar days before the expiration of the original Primary Term by notifying Lessor in writing of Lessee's intent to exercise its option and simultaneously therewith paying to Lessor at least thirty (30) calendar days prior to the termination of the primary term a lease bonus in an amount equal to the original signing bonus of Five Thousand Nine Hundred Dollars ($5,900.00) per net acre paid to Lessor by Lessee. Such payment shall be based upon the net acres that are covered by this Lease, and not at such time being maintained by other provisions hereof. Should this option be exercised, it shall be considered for all purposes as though this Lease originally provided for a primary term of eight (8) years.

## ROYALTY AND GAS MEASUREMENT

10) As royalties, Lessee covenants and agrees:

   A) <u>Oil</u>. Lessee shall pay Lessor Twenty-One Percent (21%) of the gross proceeds of all oil, other liquid hydrocarbons and by-products produced from or on the Leasehold Estate and sold by Lessee in an arms' length transaction. In the event that Lessee sells all or part of the oil and other liquid hydrocarbons produced from the Leasehold Estate to an Affiliated Entity, the value thereof shall be the highest price offered to Lessee through Lessee's bidding process for the sale of such oil.

   B) <u>Gas</u>. Lessee shall pay Lessor Twenty-One Percent (21%) of the gross proceeds received by Lessee for all gas and other hydrocarbons and by-products produced from or on the Leasehold Estate and sold by Lessee in an arms length transaction of or through an Affiliated Entity on the sales or re-sales of such gas, the value thereof shall be the higher of (a) the sales price received by Lessee, or (b) the sale price received on all of the Affiliated Entity's sales of the aggregated production volumes, where such aggregated production volumes include production from the Leasehold Estate during applicable months of sales.

   C) <u>Market Enhancement Clause</u>. It is agreed between the Lessor and Lessee that, notwithstanding any language contained in A) and B) above, to the contrary, all royalties or other proceeds accruing to the Lessor under this lease or by state law shall be without deduction directly or indirectly, for the cost of producing, gathering, storing, separating, treating, dehydrating, compressing, processing, transporting, and marketing the oil, gas and other products produced hereunder to transform the product into marketable form; however, any such costs which result in enhancing the value of the marketable oil, gas or other products to receive a better price may be proportionally deducted from Lessor's share of production so long as they are based on Lessee's actual cost of such enhancements. However, in no event shall Lessor receive a price per unit that is less than the price per unit received by Lessee.

   D) <u>When Royalties Must Be Paid</u>: All royalties that may become due hereunder shall commence to be paid on the first well completed on the Leased Premises within one hundred-twenty (120) days after the first day of the month following the month during which any well is completed and commences production into a pipeline for sale of such production. On each subsequent well, royalty payments must commence within ninety (90) days after the first day of the month following the month during which any well is completed and commences production into a pipeline for sale of such production. Thereafter, all royalties on oil shall be paid to the Lessor on or before the last day the second month following the month of production, and all royalties on gas shall be paid to Lessor on or before the last day of the third month following the month of production. Royalties not paid when due shall bear interest at the prime rate, plus five percent (5%) per annum. Lessor may withhold royalties without obligation to pay interest in the event of a *bona fide* dispute or a good faith question of royalty entitlement (either as to ownership or as to amount).

3

E) <u>Delinquency in Payment</u>: If royalty is not paid by the date due, Lessor may give Lessee written notice of nonpayment of royalty, by certified mail, return receipt requested, and if Lessor's royalty is not paid on or before expiration of forty-five (45) days from Lessee's receipt of such notice, interest shall commence accruing on the due date and be payable by Lessee to Lessor on the delinquent balance at the rate of five percent (5%) per annum above prime interest rate. However, Lessee may avoid any interest obligation if prior to the expiration of such forty-five (45) days Lessor is furnished an attorney's written opinion citing a bona fide dispute or a good faith question of royalty entitlement (either as to ownership or as to amount), Lessee pays to Lessor the undisputed portion of Lessee pays the disputed royalty to an escrow account to be administered by a trustee agreed to by both parties or by the American Arbitration Association if such trustee cannot be found. If practical, such escrow funds shall be invested in interest bearing accounts pending resolution of the entitlement issues, with the interest to follow the distribution of escrow.

## PROPERTY TAXES

11) Lessee shall pay all Ad Valorem taxes or assessment of Lease Products or Lease Product reserves made by any local, state or federal entity or governmental unit attributable to, or resulting from the assessment of Lease Products from the Leased Premises regardless of the percentage of royalty paid to Lessor. Lessee shall, in addition, pay any and all severance taxes or other excise taxes arising out of or relating to this Lease and/or the Lease Products.

## REAL ESTATE TAXES

12) In the event real property taxes pertaining to or attributable to the Leased Premises are increased in any manner by reason of the operations of Lessee on the Leased Premises, including, but not limited to any structures or improvements constructed on the Leased Premises, Lessee shall be responsible for the amount of any such tax increase attributable to such operations or improvements. Lessee shall reimburse Lessor for the amount of such increase within thirty (30) days after Lessor provides Lessee with written documentation reflecting such increase and the basis thereof.

## LESSOR'S INTEREST

13) If Lessor owns an interest in the Leased Premises less than the entire and undivided estate herein leased, then the royalties, shut-in royalties, and rentals herein provided shall be paid by Lessee only in the proportion to which Lessor's interest bears to the whole an undivided estate. If the Leased Premises shall hereafter be subdivided, the Leased Premises shall nevertheless be developed and operated as one lease, and all royalties accruing hereunder shall be treated as an entirety, and shall be divided among and paid to such separate owners in the proportion that the acreage owned by each owner bears to the entire leased acreage. Notwithstanding any other actual or constructive knowledge or notice thereof to Lessee, it successors or assigns, no change or division in the ownership of the leased Premised or the royalties or other monies, or the right to receive the same, howsoever affected, shall be binding upon the then record owner of this Lease until thirty (30) days after there has been furnished to such record owner at his or its principal place of business by Lessor or Lessor's heirs, successors, or assigns, notice by certified mail of such change or division, supported by either originals or copies of the instruments which have been properly filed for record and which evidences such change or division, and of such court records and proceedings, transcript, or other documents as shall be necessary in the opinion of such record owner to establish the validity of such change or division. If any such change in ownership occurs by reason of the death of the Lessor, Lessee may nevertheless pay or tender such royalties or other moneys, or part thereof, to Lessor. Lessee shall not be bound by any change of the address of Lessor until furnished by certified mail with such documentation from Lessor as Lessee may reasonably require.

## TOP LEASE/RIGHT OF FIRST REFUSAL

14) In the event Lessor chooses to grant any remaining rights reserved by Lessor under this Lease to any party other than Lessee, then before any such grant Lessor shall provide Lessee with a written notice by certified mail setting forth all terms and conditions of such other grant, or a true copy of any lease or other document reflecting such proposed

4

grant. Lessee shall be afforded a period of thirty (30) calendar days following receipt of such written notice during which time Lessee may elect to exercise a right of first refusal to assume the obligations of lessee or grantee under such other proposed grant on the same terms and conditions contained therein. Should Lessee so elect, Lessee shall notify Lessor in writing within such thirty (30) day period and submit therewith any upfront payments or other consideration described in said proposal, along with a signed lease or grant documents accordingly. Lessor covenants that, during the term of this lease and any extension thereof, Lessor will not execute any additional lease, top lease or successor lease, with any third party, for the rights included in the terms of this Lease on the Leased Premises, except as to the rights reserved in Lessor, as set forth above.

## DEFINITIONS

15)
  A) Division Order. Documents setting forth the proportional ownership of Lessor in Lease products.

  B) Effective Date and Primary Term. This Lease shall become effective on the date that Lessee pays the Bonus in full, pursuant to Paragraph 69 of this Lease("Effective Date"). Except as provided herein, this Lease shall remain in full force and effect for a period of five (5) years from the date Lessor executes this Lease (hereinafter, "Primary Term").

  C) Held by Production. This Lease may be held in force after the termination of the Primary Term, including any extensions in accordance with this Lease, by production from, or Operations conducted on the Leased Premises or on any unit which the Leased Premises is included in. For the avoidance of doubt, production from, or Operations conducted on one (1) unit will not maintain this Lease in force as to any other acreage contained or described in the Leased Premises within any other unit, but such production or Operations will maintain this Lease only as to the acreage within the unit or units upon which such production or Operations are being maintained or conducted.

## AUDIT RIGHTS

16) Lessee further grants to Lessor or Lessor's designee the right, at Lessor's expense, to examine, audit, copy or inspect books, records and accounts of Lessee pertinent to the purpose of verifying the accuracy of the reports and statements furnished to the Lessor, and for checking the amount of payments lawfully due the Lessor under the terms of this agreement; however, such audit rights shall be limited to not more than one audit every twelve (12) months. In exercising this right, Lessor shall give reasonable notice to Lessee of its intended audit and such audit shall be conducted during normal business hours at the office of Lessee at the sole cost and expense of Lessor. However, if the amount of deficiencies in royalty payments revealed by the audit equal or exceed one-hundred twenty-five percent (125%) of the cost and expense of the audit, then the Lessee shall bear the cost and expense of the audit, and all monies due, shall be payable within thirty (30) days of the final determination of the amounts due, and that Lessor shall be allowed to perform, at Lessor's discretion, a follow-up audit within twelve (12) months of the completion of the audit that revealed excessive deficiencies.

## METHOD OF PAYMENTS

17) All rents and royalties (except payment by gas in kind at the election of Lessor as may be provided herein) and any and all sums due hereunder from Lessee to Lessor shall be paid by one of the following methods:

  A) By check or draft tendered directly from Lessee to Lessor at Lessor's address as stated in this Lease.

  B) By direct deposit, depositing the payment to the credit of the Lessor in the bank and account number as provided in writing by Lessor to Lessee prior to such payment (which bank shall continue as depository for all sums payable hereunder until any subsequent written notice otherwise is provided by Lessor to Lessee). No payment not timely made or not made in the correct amount shall not constitute a waiver by

Lessor of any rights or remedies of Lessor under this Lease. A payment submitted electronically shall be considered timely paid if such payment is successfully transmitted to Lessor's account on or before the due date. A payment not submitted electronically shall be considered timely paid if delivered to the Lessor on or before the applicable due date or if deposited in a postpaid, properly addressed wrapper with a post office or official depository marked as so deposited by the United States postal service before the applicable due date.

## PAYMENT IN LIEU OF FREE GAS

18) Despite any pre-existing domestic gas wells and in lieu of any right of Lessor to obtain free gas, Lessee shall pay Lessor on or before January 30th of each year; in annual installments equal to the value of the first four-hundred (400) mcf of natural gas produced in the immediately preceding calendar year from one well, the surface location of which is on the leased premises. The value of said gas shall be based upon the average price received by Lessee for gas sold from the leased premises for the prior calendar year in which the production occurred. In the event no gas is sold by the Lessee in the preceding calendar year, then the value shall be the prevailing market rate for gas of such quality and quantity.

## DOMESTIC WELLS

19) Lessee shall give due regard to existing oil and gas wells, the wells operations, tanks, lines and equipment on premises, regardless of the drilling date, and Lessee, in conducting its operations hereunder, shall take such commercially reasonable precautions necessary to protect the use and operation of the oil and gas wells by Lessor or other Lessees. Lessor reserves all rights to any production from any existing oil and gas well.

## COMMENCEMENT OF OPERATION

20) The term "operations" as used in this Lease shall mean only (a) the production of oil, gas, or other liquid hydrocarbons in paying quantities subsequent to drilling or (b) the actual drilling, fracturing, fracing, hydrofracing, completing, reworking, recompleting, deepening, plugging back or repairing of a well to obtain production of oil or gas, conducted in good faith and with due diligence, whether on the Leased Premises or any lands unitized or contiguously pooled therewith. The term "operations" shall not include conducting seismic or other testing, or the laying of pipeline across the Leased Premises. Commencement of operations shall be defined as Lessee having secured a drilling permit from the State and further entering upon the herein described premises with equipment necessary to conduct one or more of the operations.

## FORCE MAJEURE

21) Should Lessee be prevented by reason of Force Majeure from complying with any express or implied covenant of this Lease (except payment of money), from conducting drilling (including fracturing) or reworking operations at the Leased Premises, then while so prevented, (a) that covenant will be suspended; (b) Lessee will not be liable for damages for failure to comply therewith; (c) this Lease will be extended so long as Lessee is prevented from conducting drilling or reworking operations under or from producing oil or gas from the Leased Premises; and, (d) the time while Lessee is so prevented will not be counted against Lessee. For purposes of this Lease, "Force Majeure" shall mean any cause that is not within the control of Lessee, and which, even with the exercise of reasonable due diligence, Lessee could not have prevented. Examples of Force Majeure include, without limitation: legal and lawful strikes, lockouts or other industrial disturbances; sabotage, wars, blockades, insurrections and riots; epidemics; landslides, lightning, earthquakes, fires, storms, warnings of imminent storms, floods, washouts and other events of nature or the elements (exclusive of normal weather patterns); restraints of governments and people and civil disturbances; and legislative, governmental or judicial actions that are resisted in good faith and temporary or permanent regulatory restraints or prohibitions applicable to the entire oil and gas industry in the area. This paragraph is, however, in all things subject to the limitations of time during which this Lease may be continued in force by the payment of shut-in royalties. Notwithstanding the foregoing, this period of extension by reason of a Force Majeure shall be limited to a cumulative total of three (3) years.

6



### SURFACE USE/SPUD FEE

22) Lessee shall pay Lessor an additional Twenty Thousand Dollars ($20,000.00) as consideration for each well pad(s) of five (5) acres or less of disturbed land. For each additional acre of disturbed land, or part thereof, Lessee shall pay Lessor an additional Six Thousand Dollars ($6,000.00) per acre. In no event shall a pad exceed ten (10) acres, without the prior written consent of Lessor. Disturbed land shall include acreage for tanks, well pad(s), equipment, roadways and other operations servicing the wells covered by this Lease.

### LOCATION APPROVAL

23) In order to minimize disruption of the Lessor's current or future use of the Leased Premises and to maintain the aesthetic value of the Leased Premises, in the opinion of the Lessor, and before Lessee commences surface disturbing operations, the final location of well pads, access roads, pipelines, canals, ditches, ponds, levees, dams, fences, telephone and power lines, compressors, dehydration facilities, pits and waterlines shall be approved by the Lessor in writing. Said approval shall not be unreasonably withheld or delayed.

In any event, Lessee shall not drill a well or locate any portion of the drilling pad, road, gate, pipeline, tank battery, any phone, electric and data collection line or other surface disturbances within five-hundred (500) feet of any structure or improvements located upon the Leased Premises without the prior written consent of the Lessor. Lessor's agreement shall not be unreasonably withheld, conditioned or delayed assuming the preceding standards are followed. For purpose of this paragraph, the five-hundred (500) foot restriction contained herein, as it pertains to well pad, shall be measured from the edge of the well pad nearest to the structure in question, and not from the bore pole.

Without a separate written agreement between Lessor and Lessee, no roadways, pipelines, tank battery, utilities or other surface disturbances shall be located, constructed or maintained on the Leased Premises unless they are for the sole purpose of producing and transporting produced materials from the Leased Premises or lands contiguously pooled or unitized there with.

### NO COMPRESSOR OR PROCESSING

24) This Lease does not grant Lessee the right to construct compression facilities on the Leased Premises other than those necessary and electrically powered for the production and transportation of products produced from the Leasehold or lands contiguously pooled or unitized therewith. Lessee agrees that the Leased Premises described herein will not be used as a central processing facility or storage area for equipment and materials. All pump jacks shall use an electric motor, where electric is reasonably available. Any motorized equipment that may remain on the Leased Premises after the drilling and fracing operations are completed shall be designed and installed utilizing means to minimize noise, including but not limited to, sound enclosures and barriers, and electrical motors if reasonably possible.

### ROADWAYS

25) Any roadways constructed by or for Lessee shall not exceed twenty (20) feet in width for the actually traveled roadbed and following the existing contours of the surrounding surface, together with a reasonable width, not to exceed six (6) feet from either edge of the actually traveled roadbed for fills, shoulders, and crosses. Maintain said roadways to the reasonable satisfaction of Lessor, which maintenance may include shaling, ditching, graveling, blading, installing and cleaning culverts, suppressing dust and spraying for noxious weeds. To the degree practicable, operations shall be designed and laid out to be concentrated in a single area so as to avoid unnecessary utilization of surface areas. To the degree practicable, pipelines and roadways are to be within the same corridor. Lessee shall make every effort to use existing logging and township roads.



## PIPELINES/NO FOREIGN GAS

26)

  A) The Lessee shall bury to a depth below forty-eight (48) inches all pipelines used to transport the Leased Premises wells' production of oil or gas and their constituents and by-products thereof, including water, brine or any other fluid or substances, to, on, and off the Leased Premises. All pipelines shall be conspicuously marked by Lessee. If Lessee chooses to lay plastic lines, said lines shall be marked by a tracer wire for purposes of electronically locating such lines. This right may not be assigned to a utility company, pipeline company or anyone else who owns no interest in the Leased Premises or not otherwise contracted or affiliated with Lessee for the purpose of carrying out the rights and obligations under this Lease. No right is granted to piggyback or expand on this term of the Lease to install electric, telephone or data lines. The right to use said pipelines terminates when production from the Leased Premises permanently ceases and all wells associated therewith are plugged and abandoned. After Lessee's right to use a pipeline on the Leased Premises terminates, Lessee shall promptly take all actions necessary or desirable to clean up, mitigate the effects of use, and render the pipeline environmentally safe and fit for abandonment in place. All such clean up and mitigation shall be performed in compliance with all applicable federal, state, and local laws and regulations, including without limitation, environmental laws. Lessee is to allow Lessor unrestricted access to and crossing of the surface by equipment typically utilized in local agricultural and timbering activities, including but not limited to tractors, plows, combines, harvesters, forwarders, loaded trucks and loaded trailers. Lessee shall "double ditch" all soil disturbances so that all topsoil will be replaced on the surface. The width of the graded subsurface pipeline right-of-way shall not exceed thirty (30) feet, with reasonable additional width required for construction, reclamation, repair and maintenance purposes. Lessee agrees that the location of any and all pipelines shall be subject to the terms of paragraph 23 herein, and in any case shall be subject to the prior consent of the Lessor, not to be unreasonably withheld.

  B) Any pipelines constructed pursuant to the terms of this lease shall be for transporting oil and/or gas from a well(s) drilled on the leased premises or lands contiguously pooled therewith unless Lessor and Lessee enter into a separate written agreement.

## POOLED PRODUCTION UNIT LIMITED

27)

  A) The production of oil or gas under the terms of this Lease will maintain this Lease beyond its primary term including any extensions thereto only as to that portion of the Leased Premises that is actually included within a well plat pooled production unit or units that contains a well or wells then producing in paying quantities for so long as such well(s) are producing in paying quantities. In the absence of well spacing units, a spacing order or other density requirements issued by ODNR's Mineral Resources Management (or other government entity with jurisdiction) for a particular well, Lessee shall designate and file a "well plat production unit", which for the purpose of this Lease, shall contain only the acreage overlaying that portion of the target formation or pool under a well that a prudent operator would deem capable of being most efficiently drained by that well while utilizing the best production technology in common use at the time of drilling. Notwithstanding any density rules applicable to any well, however, no production unit or pooled acreage assigned to any well shall exceed the following unit acreage sizes:

   (i) If the well is classified as a vertical oil or gas well, the maximum size of the pooled production unit shall be 40 contiguous acres, without the written consent of Lessor. The well shall be located in the center of the production unit to the extent practical, and such unit shall be of a square or rectangular shape consistent with state regulations.

   (ii) If the well is classified as a horizontal oil or gas well drilled to any geologic

formations containing a horizontal component of the drain hole in the target formation, whether oil or gas, then the maximum size of the pooled production unit shall not exceed 640 contiguous acres, except said pooled production unit may exceed 640 contiguous acres, but in no event larger than 1,000 contiguous acres, if the lateral extent of horizontal bore hole(s) in said formation shall extend beyond the boundary of a 640 contiguous acre unit and such that a reasonably prudent operator would expect that the entire acreage within such larger unit will be effectively and efficiently developed and drained from a central pad site location. The pooled production unit shall, to the extent practical, parallel and be centered on the lateral boreholes to be drilled within the unit, and such unit shall be of a square or rectangular shape consistent with state regulations.

B) Any well drilled on said pooled production unit whether or not the well(s) are located on the Leased Premises, shall, nevertheless be deemed to be located upon the Leased Premises within the meaning and for the provisions and covenants of this Lease to the same effect as if all the lands comprising said unit were described in and subject to this Lease; and provided further that the Lessor agrees to accept that proportion of such royalties and shut-in payments, which the amount of Lessor's acreage placed in the unit or his/her/its royalty interests therein on the acreage basis, bears to the total acreage in the unit. The Lessee shall effect such consolidation by executing a declaration of consolidation with the same formality as this Lease setting forth the lease or portions thereof consolidated and respective royalty distribution, and recording the same in the recorder's office at the courthouse in the county in which the Leased Premises are located and by mailing a copy thereof to the Lessor at the address hereinabove set forth unless the Lessee is furnished with another address. Lessee shall have the right to amend, alter, change, correct, or cancel any such consolidation unit or amended consolidation unit up to nine (9) months after the completion of the last well on a drilling pad, if, in the sole opinion of the Lessee, the amended unit would be beneficial in connection with the conservation and development of oil and gas, so long as such amendment satisfies the restrictions set forth above.

C) This Lease shall automatically terminate and be of no further force or effect as to any acreage of the Leased Premises which is not included within a producing or drilling unit at the expiration of the Primary Term, or any extension thereof, from which oil, gas, or their constituents in paying quantities are being produced from the geologic formations leased herein. Upon termination of this Lease as to any portion of the Leased Premises as provided in this paragraph, Lessee shall promptly deliver to Lessor a plat showing the designated pooled production unit(s) or well(s), acreage around each well and a partial release containing a satisfactory description of the acreage not retained, suitable for recording.

## REASONABLE DEVELOPMENT

28) If oil or gas is discovered on the Leased Premises, Lessee shall develop the Leased Premises as a reasonable and prudent operator and exercise due diligence in drilling such additional well or wells as may be necessary to fully develop the Leased Premises. Lessee shall protect the oil and gas in and under the Leased Premises from drainage by wells on adjoining or adjacent tracts or leases, including those held by the Lessee or any affiliate of Lessee. If oil or gas should be produced in paying quantities from a well on adjacent acreage that is draining any acreage of the Leased premises that is not pooled or unitized with that well or already within a producing well unit or pooled production unit, Lessee shall within six (6) months after the earlier of: (a) notice from the Lessor of such producing well or (b) Lessee's knowledge of such well having been drilled, begin in good faith and pursue diligently operations leading to the drilling of an offset well and such well shall be drilled to such a depth as may be necessary to prevent drainage of the Leased Premises, and Lessee shall use all means necessary in a good faith effort to make such well produce oil or gas in paying quantities. Any well with a borehole passing within six hundred (600) feet of the Leased Premises shall be presumed to be draining the Leased Premises. Lessee may rebut this presumption only with evidence acceptable to Lessor. The requirements of this paragraph shall be subject to the rules and regulations of the State of Ohio. Payment of the bonus, royalties to be paid, shut-in payments, or other amounts due hereunder shall not relieve Lessee from its obligations under this paragraph.

## PUGH CLAUSE

9


COPY

29)
    A) <u>Horizontal Pugh Clause</u>. Production from, or operations conducted on, one Unit will not maintain this Lease in force as to any other acreage, outside the Unit and such production or operations will maintain this Lease only as to the acreage within the Unit or Units upon which such production or operations are being maintained or conducted. Upon expiration of the Primary Term or any extension thereof, in the event a portion or portions of the leased premises is pooled or unitized with other land so as to form a Unit or Units; operations on, completion of a well upon, or production from such pooled Unit(s) will not maintain this Lease in force as to the land not included in such Unit or Units. However, this Lease may be maintained in force as to any land covered hereby and not included in such Unit or Units, in any manner that complies with this Lease's terms.

    B) <u>Vertical Pugh Clause</u>. Despite anything to the contrary, at the end of the Primary Term or any extension thereto, this Lease shall terminate as to all strata, depths, and horizons under each Unit below two hundred (200') feet below the stratigraphic equivalent of the base of the deepest formation from which production of oil and gas in paying quantities is being maintained (or in the case of a shut-in well, can be maintained) in the well on such Unit if, and only if, at any time after the expiration of the Primary Term, or any extension thereof, Lessor makes a demand in writing to Lessee that Lessee commenced development efforts at least to the extent of application for a permit with the Ohio Department of Natural Resources or other governmental entity with jurisdiction, for a well into such depths and horizons.

    C) <u>Release of Acreage</u>. Within thirty (30) days upon termination of any portion of the leased premises or all of this Lease, Lessee shall promptly deliver to Lessor a plat showing the designated pooled production Unit(s) or well(s) acreage around each well and a partial release recorded with the county or counties in which the leased premises is located containing a meets and bounds description (including a map) of the acreage and/or depths not retained. Lessee hereby grants to Lessor the right and authority, after thirty (30) days prior written notice delivered to the Lessee, as provided in this Lease, to file an affidavit of record reflecting such expiration or termination, which filing shall be binding upon Lessee and Lessee's successors and assigns. Lessee retains no rights in the released acreage.

## SHUT-IN PAYMENT/LIMITATION

30) In the event all wells drilled on the leased premises or on land pooled or unitized hereunder are shut-in because Lessee is unable to market the production therefrom, or should production in paying quantities cease from all such wells, or should the Lessee desire to shut-in all such producing wells, the Lessee agrees to pay the Lessor, commencing on the date six (6) months from the beginning of the period with no production being sold, or the cessation of production, or the shutting-in of each producing well, a shut-in payment in the amount of fifty dollars ($50.00) per acre every six (6) months until the earlier of: production is marketed and sold off the leased premises, or such wells are plugged and abandoned according to law, or six (6) months after making the fourth (4) shut-in payment. Notwithstanding the making of such shut-in payments, Lessee shall be and remain under the continuing obligation to (a) use all reasonable efforts to find a market for said gas and/or oil and to commence or resume marketing same when a market is available, (b) reasonably develop the leased premises as provided in this Lease. Upon delivery of the shut-in payment as provided herein, the Lease will continue in force and effect while production is shut-in. It is understood and agreed that, in the sole discretion of the Lessor, this Lease may not be maintained in force for any continuous period of time longer than thirty (30) months, or a cumulative period of forty-eight (48) months after the expiration of the Primary Term hereof solely by the provision of this shut-in clause.

## FIREWALLING AND MAINTENANCE

31) Dikes, firewalls or other methods of secondary containment must be constructed and maintained at all times around all tanks, separators and other receptacles so as to contain a volume of liquid equal to at least 1.25 times the total volume of such tanks, separators and other receptacles located within the boundaries of the firewall and comply with State

of Ohio regulations. Lessee shall keep all tanks and other equipment at each well location painted, and shall keep the well site and all roads leading thereto free of all noxious weeds and debris.

## PITS

32) Lessee shall have no right to dig any pits on the Leased Premises except with Lessor's prior written consent; provided, however, that Lessee may, without Lessor's consent, dig and use pits or impoundments for drilling and completion operations if (a) such pits or impoundments conform to State of Ohio requirements, (b) each pit or impoundment is planned to be deep enough to allow at least thirty-six (36) inches of backfill over the liner after grading to the surrounding pre-drill contours, and (c) pits or impoundments are drained and all pit liners and pit contents are removed from the Leased Premises and disposed of at Lessee's cost within ninety(90) days (weather permitting) promptly after completion of operations. Lessee shall immediately notify Lessor and the State of Ohio if any pit lining is torn, punctured, or otherwise breached, allowing any fluid contained in or designated to be contained in, a pit or impoundment to seep, leak or overflow through or around the liner.

## FENCE CLAUSE

33) The Lessee shall promptly replace any barriers, including but not limited to fences and walls removed by Lessee during its operations on the Leased Premises. Upon Lessor's written request, Lessee shall, at its sole cost and expense, design, install and maintain fencing around any well site(s), tank battery(ies), or facility(ies) installed on the Leased Premises by Lessee. All cattle guards and fences installed by Lessee shall be kept clean and in good repair and shall be capable of turning horses, sheep, goats, and cattle.

## GATE CLAUSE

34) Upon the written request of Lessor, Lessee shall install, at its sole cost and expense, a gate at the entrance of any access road on the Leased Premises. Lessor shall be provided a key to the gate and allowed free use.

## WATER DAMAGE

35) Lessee shall maintain the quality and quantity of Lessor's water supplies (including but not limited to all supplies, wells, creeks, streams, ponds, and springs) for domestic and livestock use to be measured by testing Lessor's water supplies: (a) prior to the commencement of any operations upon the Leased Premises (or within a drilling unit in which the Leased Premises is located or within one-thousand five-hundred (1,500) feet of any well bore); (b) at the completion of any operations upon or beneath the Leased Premises (or within a drilling unit in which the Leased Premises is located or within one-thousand five-hundred (1,500) feet of any well bore); and, (c) as deemed necessary by Lessor due to changes in water flow or quality, including but not limited to color, smell or taste. Should any of Lessor's water supply be polluted or reduced, Lessee shall take any and all steps to restore water quality and quantity to its pre-existing condition at Lessee's cost and fully compensate Lessor for the damage caused thereby. During the period of remediation, Lessee shall supply Lessor with an adequate supply of potable water at Lessee's cost consistent with Lessor's use of the damaged water supply prior to Lessee's operation. Any pollution or reduction of any water supply after any operations commence will be presumed to be the result of Lessee's operations unless Lessee can prove otherwise, with Lessee having the burden of proof by clear and convincing evidence. Until Lessee can prove otherwise as to cause, Lessee shall provide the required replacement supply, beginning immediately upon Lessor's providing evidence to Lessee of the water quality and quantity condition causing concern. Testing of Lessor's water supply shall be at Lessee's cost, and shall be conducted by an independent testing laboratory certified by the Ohio Environmental Protection Agency and/or the Ohio Department of Health, that is mutually agree upon in writing by the parties, that is qualified to test water for methane and any and all chemicals and agents utilized by Lessee in its operations. The burden shall be upon Lessee to provide evidence of all such chemicals and agents in order for the testing agent to adequately test the water. Lessor shall be provided complete copies of any and all testing results and data and shall have full rights to contact the testing lab for inquiry and information.



## NO USE OF WATER

36) Lessee shall not use water from Lessor's surface, subsurface, wells, ponds, lakes, springs, creeks or reservoirs ("Water") located on the Leased Premises without first obtaining the prior written consent of Lessor. Lessor and Lessee contemplate negotiations and agreement for the cost for onsite water usage but neither party is bound to offer to pay, or accept said offer, for any reason. Lessee shall be fully responsible for any material damage caused to Lessor's Water by any operations conducted pursuant to this lease.

## POWERLINES

37)
   A) <u>Overhead Lines</u>: Lessee will consult with Lessor and with the independent power company supplying power to Lessee with respect to the location of overhead power lines prior to construction. Overhead power lines will be constructed so as to cause the least possible interference with Lessor's visual landscape and Lessor's existing and future use of the leased premises, and to the maximum extent possible overhead power lines will be constructed along fence lines or property lines. All overhead lines shall not hang lower than fourteen (14) feet above the terrain.

   B) <u>Buried Lines</u>: All power lines constructed by Lessee downstream of the independent power company's meters shall be buried and all power line trenches shall be fully reclaimed and reseeded to the satisfaction of Lessor. For buried lines, Lessee shall pay Lessor a one-time payment of fifty dollars ($50.00) per rod (16.5 ft.) unless such power line is installed in the same ditch and the same time as the pipelines described herein, in which case there will be no duplication of payment. Any lines authorized under this paragraph shall be buried to a depth of at least forty-eight (48) inches below grade, and at a location consented to by Lessor, however such consent shall not be unreasonably withheld, conditioned or delayed.

## HUNTER

38) Lessee agrees that its employees, agents, subcontractors, and independent contractors shall have no right to and are prohibited from firing any firearms, hunting or fishing, on the Leased Premises, without the written permission of the Lessor.

## TIMBER REMOVAL

39) Lessee shall notify Lessor prior to the removal of any standing timber in a sufficiently timely manner, and in no event later than thirty (30) calendar days prior to any removal of timber, so as to allow Lessor to obtain an appraisal of such timber by a certified, professional forester. Lessor shall have the option to take payment from Lessee for said timber at the appraised value prior to its removal or to take possession of said timber after its removal by Lessee, or at the option of Lessor, the timber may be harvested by Lessor. If Lessor opts to take possession after Lessee removes any timber, Lessee shall cut and set aside logs so as to be accessible, exercising due care in cutting and handling said timber so as to preserve its market value. Lessee shall remove any uprooted stumps from the leased premises at Lessor's request. Upon Lessee giving Lessor the thirty (30) day notice, Lessor can exercise within said thirty (30) day period of time to remove the timber as necessary for Lessee's use of the premises.

## CROP DAMAGE

40) Lessee shall plan surface operations in a manner that will reduce or minimize the intrusion to crop and timber fields. In the event that such intrusion cannot be avoided, Lessee shall compensate either Lessor or any tenant (but not both) for the damage at current market value for the projected yield at full maturity.

## NO HAZARDOUS MATERIAL

41) Lessee shall not use, dispose, or release on the leased premises or to permit to exist or be used, disposed of or released on the leased premises as a result of its operations, any substances (other than those Lessee has been licensed or permitted by applicable public authorities or governmental entities with jurisdiction to use on the leased premises) which are defined as a "hazardous material" or "toxic substance" or "solid waste" in applicable federal, state, or local laws, statutes or ordinances. Should any hazardous material, toxic substance, solid waste be released on the leased premises, for any reason, in any quantity, Lessee shall notify all appropriate governmental entities of such an event, and then immediately thereafter notify the Lessor.

## HYDROFACTURING

42) Lessee represents and warrants that during any hyrdrofracturing process it will not use kerosene, benzene, toluene, xylene, and formaldehyde or any harmful carcinogens or other agents believed to cause cancer for the purposes of fracturing or pumping the same into any formation under the leased Premises and will provide Lessor with all Material Safety Data Sheets (MSDS) available for any chemicals used by Lessee in their hydrofracturing process on the Leased Premises.

## RECLAMATION CLAUSE

43) Lessee shall restore the Leased Premises to as near as possible to its original condition within ninety (90) days after well completion or within thirty (30) days after any pipeline is installed, weather permitting; however, in the case of a multi-well pad location, within ninety (90) days after the completion of the final well completed from the pad location, weather permitting. Original condition shall include, but not be limited to reseeding any areas that were kept in grass or pasture, allowing the well site pad(s) and access road(s) to remain for normal and customary operational purposes. A well once commenced shall be completed and placed into production with due diligence. If at any time during the existence of a Lessee surface operation or at any time for one (1) year following the existence of a Lessee's surface operation, the soil should settle, wash or erode, causing a depression, and such depression cannot reasonably be attributed to any other cause than Lessee's operation, Lessee shall level such depression and smooth the surface to substantially the same level as existed before construction. Under such circumstances, at any time and from time to time while this Lease or any of its terms and provisions is in full force and effect, upon request of Lessor, Lessee agrees to correct, level and restore to the original ground level with topsoil or material specified by Lessor if such other material is of a lesser cost than topsoil, any further settlement of the soil that may occur following the previous filling or leveling of the same, by the Lessee so as to fully restore and maintain the surface of Lessor's property, and protect Lessor's property against erosion.

## RESEEDING

44) All reseeding shall be done with suitable grasses selected by Lessor and during a planting period selected by Lessor. Reseeding shall be performed in a manner to place the Leased Premises in a condition that is as close as possible to its pre-drilling condition. In the absence of direction from the Lessor, no reseeding (except for barrow pits) will be required on any existing access roads. It shall be the duty of Lessee to insure that a growing ground cover is established upon the disturbed soils and Lessee shall reseed as necessary to accomplish that duty, Lessee shall inspect disturbed areas at such times as Lessor shall reasonably request in order to determine the growth of ground cover and/or noxious weeds, and Lessee shall reseed ground cover and control noxious weeds from time to time to the extent necessary to accomplish its obligations hereunder.

## SURFACE DAMAGE

45) Unless specifically otherwise set forth herein, Lessee will pay Lessor for all damages to the surface or subsurface of the Leased Premises as a result of Lessee's operations and/or exercise of any rights granted in this Lease at the value determined by a mutually agreeable third party, or in the event no such party can be agreed upon, a court of law. In

13

all cases, Lessee agrees that it shall keep the Leased Premises in a neat and clean condition.

## INSURANCE/HOLD HARMLESS

46)

A) Insurance: A company licensed by the Ohio Department of Commerce-Division of Insurance to do business within the State of Ohio shall underwrite all policies required by this paragraph. Provided, however, such insurance requirements maybe met by a combination of self-insurance, primary and excess insurance Policies. Lessee shall carry the following insurance with one or more insurance carriers at any and all times such party or person is on or about the leased premises or acting pursuant to this Lease in such amounts as from time to time reasonably required by Lessor. Lessee shall endeavor to assure that any person acting on Lessee's behalf under this lease shall carry substantially similar insurance:

   i. Workers' Compensation and Employer's Liability Insurance

   ii. Commercial General Liability and Umbrella Liability Insurance ($5,000,000.00 Minimum Coverage);

   iii. Business auto and Umbrella Liability Insurance ($5,000,000.00 Minimum Coverage);

   iv. Environmental Liability Insurance ($5,000,000.00 Minimum Coverage).

Upon Lessor's request, the Lessee shall cause Certificates of Insurance evidencing the above coverage to be provided promptly upon request to Lessor. The Commercial additional named insured with regard to the leased premises.

B) Hold Harmless: Lessee agrees to indemnify and hold Lessor harmless from any and all liability, drainages, environmental damages, reasonable attorney's fees, expenses, causes of action, suits, claims or judgments of any kind or character for injury to persons or property caused by Lessee's operations on the subject lands.

C) Indemnity: Lessee and its successors and assigns, shall defend, indemnify, release and hold harmless Lessor and Lessor's heirs, successors, representatives, agents and assigns ("Indemnitees"), from and against any and all claims, liabilities, judgments, demands and causes of action for injury (including death) or damages and losses to persons or property arising out of, incidental to or resulting from the operations of or under the terms of this Lease, or due to, Lessee or Lessee's servants, agents, employees, guests, licensees, invitees or independent contractors, and from and against all costs and expenses incurred by Indemnitees by reason of any such liabilities, claims, acts of God, force majeure, regulatory or environmental issues, damages or loss of any property, injuries or death, including attorneys' fees, fines, penalties, interests, costs, and losses; and each assignee of this Lease, or an interest holder therein, agrees to indemnify and hold harmless Indemnitees in the same manner provided above. Each assignee of the Lessee, or any interest therein, agrees to indemnify and hold harmless to the Indemnitees as if said assignee were party to this Lease when executed. Such indemnity shall apply, but not be limited to, to any claim arising out of operations conducted under or pursuant to this Lease, howsoever caused. The provisions of this paragraph shall survive the termination of this Lease.

## NON DISTURBANCE

47) Lessee and its employees and authorized agents shall not disturb, use or travel upon any of the land of Lessor not being used due to this lease.

## NO WARRANTY OF TITLE

48) This Lease is made without warranty of title express, implied or statutory. Lessee agrees that this Lease is made and accepted subject to all easements, rights-of-way, oil and gas leases, and other mineral leases recorded prior to the recording of this Lease. Lessee further agrees that Lessor Leases to Lessee only the oil and gas rights, as defined in

Paragraph 1 owned by Lessor in accordance with the deeds and instruments of record. Lessor makes no representations as to its right, title or interest in the leased premises, and does not warrant title or agree to defend title to the Leased Premises. Lessee will bear all costs and expenses incurred in curing any title defect or defending title to said lands.

## SUBORDINATION

49) Lessee agrees and acknowledges that any unsubordinated pre-existing mortgage on the leased premises that covers Lessor's oil and gas rights may constitute a title defect, except to the extent cured by Ohio Codified Laws and if there does exist said title defect and the well or well bore is on or directly under the leased premises, the title defect must be cured by Lessor obtaining a subordination of that mortgage.

## RIGHT OF PURCHASE

50) Lessors shall have the first option to purchase any vertically drilled well located upon the Leased Premises and such well equipment necessary to operate the same at fair market salvage value, less estimated plugging costs, when any well has ceased to produce in paying quantities in the judgment of the lessee. Lessor shall have thirty (30) days, after receiving written notice, to exercise its option to purchase. Should Lessor purchase any well or wells, it shall assume the responsibility of eventually plugging the same and shall execute such documents to this end with the State of Ohio as the State may require to effect proper well transfer.

## BINDING ON SUCCESSORS AND ASSIGNS

51) This lease and all of its terms, conditions, covenants and stipulations shall extend to and be binding on all hefts, personal representatives, successors and assigns of Lessor and Lessee.

## ADDITIONAL DOCUMENTS

52) Lessor further agrees to sign such additional documents as may be reasonably requested by Lessee to perfect Lessee's title to the oil and gas leased herein, as described in paragraph 1, and such other documents relating to the sale of production as may be required by Lessee or others. Said obligation includes but is not limited to modifying or amending any legal descriptions to release acreage which does not have marketable title or correcting any inaccurate legal descriptions.

## FUTURE MORTGAGES AND ENCUMBRANCES

53) Lessor may at any time, without provided notice to Lessee, mortgage Lessor's interest in all or any part of the leased premises, or grant any easement or other servitude, including but not limited to other leases, as Lessor deems necessary and appropriate, and which do not interfere with Lessee's rights herein.

## CONDEMNATION

54) Any and all payments made by a Condemner on account of taking by eminent domain shall be the property of the Lessor, except a taking or diminishment of Lessee's interest in either the rights and privileges granted in the leasehold estate created hereby or the oil and gas reserves located within the leased premises, and in the event of such a taking or diminishment of Lessee's interests and/or rights, Lessee shall be entitled to its proportionate share of any payments, and shall further have a right of standing in any proceeding of Condemnation.

## PARTIAL RELEASE

55) Lessee shall have the right at any time during this Lease to release from the lands covered hereby any lands subject to this lease and thereby may be relieved of all obligations hereafter accruing to the acreage so released, provided that (a) Lessee may not release any portion of this Lease included in a pooled unit so long as operations are being

COPY

conducted on such unit, and (b) any such partial release must release all depths in and under the lands so released.

## TERMINATION OF RECORD AND MEMORANDUM OF LEASE

56)

A) Upon termination of the Lease as to any portion of the Leased Premises, Lessee shall promptly deliver to Lessor a plat showing the designated production units around each well and a partial release containing a description (metes and bounds and map) of the acreage and depths not retained, in a form suitable for recording. In addition, Lessee shall peaceably surrender the released premises to Lessor and remove any and all facilities, equipments and machinery from the site within ninety (90) days at Lessee's expense. Further, the affected land shall be reclaimed in accordance with the terms of this Lease.

B) Upon termination of this Lease or any portion thereof, or upon expiration of this Lease, Lessee shall provide Lessor documentation in recordable form of such termination or expiration within thirty (30) calendar days after receipt of written notice from Lessor.

C) This Lease shall not be recorded by either party hereto. Lessor and Lessee shall execute a Memorandum of Lease for recording which shall set forth the names and addresses of the parties hereto, the description of the Leased Premises, the term of this Lease and the rest of the provisions hereof shall be incorporated by reference. Lessee shall be entitled to immediately record the Memorandum of Lease in the applicable county records, *provided however*, that recording of the Memorandum of Lease shall not be deemed to be an acceptance by Lessee of this Lease unless and until Lessee pays the Bonus in full prior to the Payment Date, pursuant to Paragraph 69. If Lessee determines to its reasonable satisfaction after its title due diligence review that the Lessor does not have marketable title to the Leased Premises, or if Lessee does not pay the Bonus payment in full prior to the Payment Date for any reason, then Lessee shall promptly release any recorded Memorandum of Lease it may have filed and this Lease shall terminate.

## DEFAULT

57)

A) In addition to any incidents of default described throughout this Lease, the occurrence of any of the following constitutes a default hereunder:

  i. If any creditor of Lessee and/or assigns shall take any action to execute on, garnish, or attach the assets of the Lessee, or

  ii. If a request or a petition for liquidation, reorganization, adjustment of debts, arrangement, or similar relief under the bankruptcy, insolvency or similar laws of the United States or any state or territory thereof or any foreign jurisdiction shall be filed by or against Lessee or any formal or informal proceeding for the reorganization, dissolution or liquidation of settlement of claims against, or winding up of affairs of the Lessee; or the garnishment, attachment, or taking by governmental authority of all collateral or other property of Lessee.

B) Upon default by Lessee, Lessor shall be entitled to exercise any and all remedies available at law, in equity or otherwise, each such remedy being considered cumulative. No single exercise of any remedy set forth herein shall be deemed an election to forego any other remedy and any failure to pursue a remedy shall not prevent, restrict or otherwise modify its exercise subsequently. In the event of default, Lessor shall be entitled to recover against Lessee any attorney's fees, investigation charges, filing fees, court costs, expert fees, or other similar expenses or costs expended by Lessor, should Lessee not voluntarily release said lease.

## HOLDING OVER

58) If Lessee continues in possession of any or all of the Leased Premises after termination or

expiration of this Lease (Whether such termination occurs by lapse of production, default or otherwise) other than for the purpose of plugging abandoned wells, removing equipment, and restoring the Leased Premises as required by this Lease, Lessee shall be considered a tenant at will. Fair rental damages shall be the amount calculated in the amount of the fair rental value at the time of the annual rental value at the time of the termination or expiration of the Lease. The terms of this Lease shall continue to apply to Lessee's continued possession provided that (a) Lessor shall have the right to evict and remove Lessee and Lessee's property from all or any of the Leased Premises at any time, and (b) Lessee shall be liable to Lessor for any and all damages suffered by Lessor as a result of Lessee's continued possession of any or all of the Leased Premises.

## SEVERABILITY

59) If any provision of this Lease is held invalid or unenforceable by any court of competent jurisdiction, the other provisions of this Lease will remain in full force and effect. Any provision of this Lease held invalid or unenforceable only in part or degree will remain in full force and effect to the extent not held invalid or unenforceable.

## GOVERNING LAW

60) This Lease shall be governed and construed in accordance with the laws of the State of Ohio. Any and all disputes must be resolved, in a common pleas court located solely in the State of Ohio, and shall not be resolved by arbitration.

## LESSER INTEREST

61) In case the Lessor owns a lesser interest in the Leased Premises than the entire or undivided fee simple interest therein, then the royalties, delay rentals and other payments herein provided for shall be paid to the Lessor in the proportion which such interest bears to the whole or undivided fee.

## APPORTIONMENT OF PAYMENTS

62) If the Leased Premises shall hereafter be divided in severalty or in separate tracts, the Leased Premises nevertheless shall continue to be developed and operated as one lease, and all rentals, royalties, and payments provided for shall be treated as an entirety and shall be divided among, and paid to, such separate owners in the proportion that the acreage owned by each such separate owner bears to the entire leased acreage.

## OWNERSHIP CHANGE

63) No change or division in ownership of Lessor's interest in this Lease shall operate to enlarge the obligations or diminish the rights of Lessor. No change or division in Lessor's ownership in the Leased Premises or in the rentals or royalties hereunder shall be binding on the Lessee until Lessee has received written notice by certified mail and has been furnished with the certified copy of the recorded deed or conveyance thereof.

## REPORTS AND DOCUMENTS

64) Lessee shall notify Lessor of any judicial proceedings brought to the attention of lessee affecting its possession under the Lease or the interest of Lessor in the Leased Premises.

## AUTHORSHIP AND WAIVER

65) For the purpose of construction, interpretation and/or adjudication, it shall be deemed that Lessee and Lessor contributed equally to the drafting of this instrument. The failure of either party to enforce or exercise any provision of this Lease shall not constitute or be considered as a waiver of the provision in the future unless the same is expressed in writing and signed by the respective parties.

## DOWER

66) In consideration of the execution of this Lease, Lessor hereby release and relinquishes all Lessor's rights and expectancies of dower in the Lease.

67) Lessee, and any successor Lessee, shall have the right to assign and transfer the within Lease, in whole or in part; provided, however, that the Lessee shall first give advance, written notice to Lessor of such assignment, which assignment designates the assignee.

## NOTICE

68) If at any time after the execution of the Lease, it shall become necessary or convenient for one of the parties to serve any notice, demand or communication upon the other party, such notice, demand or communication shall be in writing signed by the party serving notice, sent by nationally recognized overnight carrier or registered or certified United States mail, return receipt requested and postage or other charges prepaid. Any such notice if intended for Lessor shall be addressed to the address set forth in the first paragraph of this Lease, and if intended for Lessee, the notice shall be addressed to the address set forth in the first paragraph of this Lease, or to such other address as either party may have furnished to the other in writing as a place for the service of notice. Any notice so sent shall be deemed to have been given/served as of the time it is deposited with the overnight carrier or in the United States mail.

## BONUS PAYMENT

69) Upon execution of this Lease, Lessee shall pay a sum equal to $10 per net acre covered by this Lease. This Lease shall not be effective unless and until Lessee pays the balance of the Bonus payment, as adjusted according to the net mineral acres covered by this Lease as confirmed by Lessee's title review, to Lessor within one hundred and twenty (120) days of Lessor's execution of this Lease (the "Payment Date"), *provided however*, that if despite commercially reasonable efforts Lessee is unable to complete its title review within said 120 days due to overcrowding at the courthouse, Lessee may extend the Payment Date by an additional thirty (30) days. In the event Lessor does not receive the balance of the Bonus, as may be adjusted based on Lessee's title review, on or before the Payment Date, then this Lease shall automatically become null and void. Promptly after any termination, expiration or voiding of this lease, Lessee shall provide Lessor with a copy of an appropriate release of the Memorandum of Lease and Lessor shall cause the same to be filed of record.

**IN WITNESS WHEREOF**, the Lessor(s) hereunto set their hand(s) on the day and year first above written.

LESSOR(S)                                                WITNESS

By: **Elaine Grissom**

By: **James Grissom**

## ACKNOWLEDGMENT

STATE OF OHIO            )
COUNTY OF MONROE   )

On the _____ day of _____, 2012, before me, the undersigned officer, personally appeared **Elaine Grissom and James Grissom**, known to me or satisfactorily proven to be the person(s) whose name(s) is/are subscribed to the within instrument, and acknowledged that he/she/they executed the same for the purposes therein contained.

In witness whereof, I hereunto set my hand and official seal.

Notary Public

18

67) Lessee, and any successor Lessee, shall have the right to assign and transfer the within Lease, in whole or in part; provided, however, that the Lessee shall first give advance, written notice to Lessor of such assignment, which assignment designates the assignee.

## NOTICE

68) If at any time after the execution of the Lease, it shall become necessary or convenient for one of the parties to serve any notice, demand or communication upon the other party, such notice, demand or communication shall be in writing signed by the party serving notice, sent by nationally recognized overnight carrier or registered or certified United States mail, return receipt requested and postage or other charges prepaid. Any such notice if intended for Lessor shall be addressed to the address set forth in the first paragraph of this Lease, and if intended for Lessee, the notice shall be addressed to the address set forth in the first paragraph of this Lease, or to such other address as either party may have furnished to the other in writing as a place for the service of notice. Any notice so sent shall be deemed to have been given/served as of the time it is deposited with the overnight carrier or in the United States mail.

## BONUS PAYMENT

69) Upon execution of this Lease, Lessee shall pay a sum equal to $10 per net acre covered by this Lease. This Lease shall not be effective unless and until Lessee pays the balance of the Bonus payment, as adjusted according to the net mineral acres covered by this Lease as confirmed by Lessee's title review, to Lessor within one hundred and twenty (120) days of Lessor's execution of this Lease (the "Payment Date"), *provided however*, that if despite commercially reasonable efforts Lessee is unable to complete its title review within said 120 days due to overcrowding at the courthouse, Lessee may extend the Payment Date by an additional thirty (30) days. In the event Lessor does not receive the balance of the Bonus, as may be adjusted based on Lessee's title review, on or before the Payment Date, then this Lease shall automatically become null and void. Promptly after any termination, expiration or voiding of this lease, Lessee shall provide Lessor with a copy of an appropriate release of the Memorandum of Lease and Lessor shall cause the same to be filed of record.

**IN WITNESS WHEREOF**, the Lessor(s) hereunto set their hand(s) on the day and year first above written.

LESSOR(S)                                                     WITNESS

_____            _____
By: **Elaine Grissom, Individually and as**
**Attorney-in-fact for James Grissom, her husband**

## ACKNOWLEDGMENT

STATE OF OHIO          )
COUNTY OF MONROE    )

On the _____ day of _____, 2012, before me, the undersigned officer, personally appeared **Elaine Grissom, Individually and as Attorney-in-fact for James Grissom, her husband**, known to me or satisfactorily proven to be the person(s) whose name(s) is/are subscribed to the within instrument, and acknowledged that he/she/they executed the same for the purposes therein contained.

In witness whereof, I hereunto set my hand and official seal.

_____
Notary Public

67) Lessee, and any successor Lessee, shall have the right to assign and transfer the within Lease, in whole or in part; provided, however, that the Lessee shall first give advance, written notice to Lessor of such assignment, which assignment designates the assignee.

## NOTICE

68) If at any time after the execution of the Lease, it shall become necessary or convenient for one of the parties to serve any notice, demand or communication upon the other party, such notice, demand or communication shall be in writing signed by the party serving notice, sent by nationally recognized overnight carrier or registered or certified United States mail, return receipt requested and postage or other charges prepaid. Any such notice if intended for Lessor shall be addressed to the address set forth in the first paragraph of this Lease, and if intended for Lessee, the notice shall be addressed to the address set forth in the first paragraph of this Lease, or to such other address as either party may have furnished to the other in writing as a place for the service of notice. Any notice so sent shall be deemed to have been given/served as of the time it is deposited with the overnight carrier or in the United States mail.

## BONUS PAYMENT

69) Upon execution of this Lease, Lessee shall pay a sum equal to $10 per net acre covered by this Lease. This Lease shall not be effective unless and until Lessee pays the balance of the Bonus payment, as adjusted according to the net mineral acres covered by this Lease as confirmed by Lessee's title review, to Lessor within one hundred and twenty (120) days of Lessor's execution of this Lease (the "Payment Date"), *provided however*, that if despite commercially reasonable efforts Lessee is unable to complete its title review within said 120 days due to overcrowding at the courthouse, Lessee may extend the Payment Date by an additional thirty (30) days. In the event Lessor does not receive the balance of the Bonus, as may be adjusted based on Lessee's title review, on or before the Payment Date, then this Lease shall automatically become null and void. Promptly after any termination, expiration or voiding of this lease, Lessee shall provide Lessor with a copy of an appropriate release of the Memorandum of Lease and Lessor shall cause the same to be filed of record.

**IN WITNESS WHEREOF**, the Lessor(s) hereunto set their hand(s) on the day and year first above written.

LESSOR(S)                             WITNESS

*Elaine Grissom*                       *Sarah E. Frum*
By: **Elaine Grissom, Individually and as**
**Attorney-in-fact for James Grissom, her husband**


## ACKNOWLEDGMENT

STATE OF OHIO      )
COUNTY OF MONROE   )

On the __10__ day of __February__, 2012, before me, the undersigned officer, personally appeared **Elaine Grissom, Individually and as Attorney-in-fact for James Grissom, her husband**, known to me or satisfactorily proven to be the person(s) whose name(s) is/are subscribed to the within instrument, and acknowledged that he/she/they executed the same for the purposes therein contained.

In witness whereof, I hereunto set my hand and official seal.

SARAH E FRUM
Notary Public, State of Ohio
My Commission Exp. April 04, 2012

*Sarah E. Frum*
Notary Public

18