UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION

**THE GRISSOMS, LLC, on behalf of itself and a class of similarly situated plaintiffs,**

    **Plaintiffs,**

    v.

**ANTERO RESOURCES CORPORATION,**

    **Defendant.**

    Case No. 2:20-CV-2028
    **JUDGE EDMUND A. SARGUS, JR.**
    **Magistrate Judge Elizabeth A. Preston Deavers**

## OPINION AND ORDER

This matter is before the Court on Defendant's Motion for Summary Judgment. (ECF No. 85.) Plaintiffs responded in opposition (ECF No. 90) and Defendant filed its reply in support of its motion (ECF No. 95). Plaintiffs submitted a Motion for Partial Summary Judgment (ECF No. 88), which too is fully at issue (ECF Nos. 91, 94). For the reasons stated herein, the Court **DENIES** Defendant's Motion for Summary Judgment (ECF No. 85) and **GRANTS** Plaintiff's Motion for Partial Summary Judgment (ECF No. 88).

### I.

This case involves a contract dispute related to oil and gas royalties. Plaintiff Grissoms LLC filed a Complaint with Jury Demand on behalf of itself and those similarly situated ("Class Plaintiffs") against Defendant Antero Resources Corporation ("Antero or Defendant") "to obtain money damages from Defendant for its alleged underpayment of royalties owed to the Class Plaintiffs in connection with Defendant's receipt of gross proceeds from the sale of marketable natural gas liquids ('NGLs')." (Compl. at 1, ECF No. 1.)

The Class Plaintiffs allege that Defendant breached the contract ("2012 Form Lease") by underpaying them for NGL products (Count One) and for Y-Grade products (Count Two). (*Id.* at 20–21.) Plaintiff sought certification of a class of 370 persons who executed leases with Antero for mineral interests underlying 155 horizontal wells (the "Class Wells") that are part of the Seneca common production system. The Class Wells transform wellhead gas produced by 194 Antero-owned horizontal wells in the Ohio Utica Shale Formation in Noble, Belmont, and Monroe Counties, Ohio, into residue gas and NGL purity products (*i.e.*, natural gas liquids in individual component form such as propane, ethane, butane, isobutane, pentane, iso-pentane) for sale in commercial markets. This Court certified the class.

The parties agree that from April 2016 to July 2022, Defendant Antero deducted from the royalty payments the post-production processing and fractionation costs, which it labels as "PRC2." The parties disagree as to whether these deductions are in violation of the 2012 Form Lease, specifically the provision referred to as the Market Enhancement Clause.

Currently, Defendant Antero deducts only the PRC2 costs from the royalty payments. Antero has never deducted GTH3 (Antero gathering), CMR1 (Antero compression), or TRN (transportation without market enhancement) from Class members' royalty payments. (Delgado Dep. 17:25–18:10.) Antero has filed a counterclaim seeking a declaration that going forward it can deduct all post-production costs from the Plaintiff Class's royalty payments. (Answer and Counterclaim, ECF No. 15.)

## II.

The individuals and companies that make up the Plaintiff Class all signed the Form 2012 Lease with Antero, which contains the identical royalty language. Antero began production on the leased land shortly after the leases were signed. Antero set up the Class Wells, and began

using them to extract "the product," otherwise known as the natural gas stream.  In its raw form, the natural gas stream contains a mixture of a few materials.  The amalgam of condensate, gas, water, and solid contaminants is produced through the wellbore, and then separated into their component parts.  (Report of Def. Expert Lesa Adair at 16, ECF No. 85-3.)  The solid contaminants are removed first, and then the remaining mixture is parted into water, liquid hydrocarbons, and gaseous hydrocarbons.  (*Id*. at 5.)  This is done near the well, on what is known as the "well pad."  (*Id*. at 16.)  Once the mixture is broken into its individual components, Antero's expert opines that the gas is suitable for delivery to the gathering pipeline.  (*Id*., at 16–17.)

After the gaseous hydrocarbons have been aggregated from the wellpads, Antero gathers, compresses, and dehydrates them.  (*Id*. at 17.)  It does this with the assistance of the Antero Midstream Corporation, a midstream company partially owned by Antero.  (*Id*.)  The gas is then moved to the Seneca Processing Plan, which is owned by MarkWest Energy Partners.  (*Id*.)

At MarkWest's facility, the gas is further processed and refined into two individual streams:  a residue gas stream and a NGL mixture referred to as "Y-Grade."  (*Id*., at 19.)  The residue gas, now at a BTU (British thermal unit) level acceptable to transmission pipelines, is then directly sold by Antero to natural gas commodity markets via inter-state transmission pipelines.  For transmission pipeline services, the pipeline operators charge Antero a fee denoted as "TRN" and "TRN3" in Antero's internal accounting system.  (Def. Expert Adair Merit's Rep., ECF No. 88-7.)

Antero's royalty accounting department uses a code system to pay royalties to Class members on residue gas and NGL purity product sales, as follows: (1) Antero's land department assigns each lease a "LDO Competent Update Code" based on lease language, and (2) Antero's

3

accounting department calculates royalties based on a formula assigned to that code. (Def. Account Delgado Dep. at 21:9–22:2, 24:5-26:18.)

All Plaintiff Class leases are assigned LDO Code 2, which is referred to internally by Antero as the market enhancement code. (Def.' CFO Alvyn Schopp Dep. at 51:12–52:11, 63:2–64:5 & Ex. 5.) Under this code, the Plaintiff Class is only subject to deductions for "market enhancement components," which are TRN3 (i.e., Gas transportation with market enhancement), and PRC2 (all processing fees on liquids). Antero has never deducted GTH3 (Antero gathering), CMR1 (Antero compression), or TRN (transportation without market enhancement) from Class members' royalty payments. (Delgado Dep. 17:25–18:10.)

Antero only deducts from Class Members' royalties a pro-rata share of processing and fractionation costs (which, along with NGL transportation costs, are referred to as "PRC2," depending on the outcome of an analysis that Antero performs. (CFO Schopp Dep. at 52:13-53:6.) That is, Anero, on a monthly basis, chooses the method that results in the highest royalties for class members between two methodologies referred to as Processed Royalty and Wellhead Royalty. (Decl. of CFO Schopp at 3, ECF No. 85-2.)

## III.

Summary judgment is appropriate "if the movant shows that there is no genuine issue as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). The Court may therefore grant a motion for summary judgment if the nonmoving party who has the burden of proof at trial, fails to make a showing sufficient to establish the existence of an element that is essential to that party's case. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Barnhart v. Pickrel, Schaeffer & Ebeling Co.*, 12 F.3d 1382, 1388–89 (6th Cir. 1993). To avoid summary judgment, the nonmovant "must do more than simply show that there is some

4

metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986); *accord Moore v. Philip Morris Cos.*, 8 F.3d 335, 340 (6th Cir. 1993). "[S]ummary judgment will not lie if the dispute about a material fact is 'genuine,' that is, if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

In evaluating a motion for summary judgment, the evidence must be viewed in the light most favorable to the nonmoving party. *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 158–59 (1970); *see Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150 (2000) (stating that the court must draw all reasonable inferences in favor of the nonmoving party and must refrain from making credibility determinations or weighing evidence). Furthermore, the existence of a mere scintilla of evidence in support of the nonmoving party's position will not be sufficient; there must be evidence on which the jury reasonably could find for the nonmoving party. *Anderson*, 477 U.S. at 251; *see Copeland v. Machulis*, 57 F.3d 476, 479 (6th Cir. 1995); *see also Matsushita*, 475 U.S. at 587–88 (finding reliance upon mere allegations, conjecture, or implausible inferences to be insufficient to survive summary judgment). It is with this standard in mind that the instant motions will be decided.

The moving party bears the burden of production first. "The moving party bears the burden of showing the absence of a genuine issue of material fact as to at least one essential element on each of Plaintiff's claims." *See Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986). The non-moving party then must present sufficient evidence from which a jury could reasonably find for it. *See Anderson Liberty Lobby, Inc*., 477 U.S. 242, 249 (1986). The court must determine "whether the evidence presents sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Id*. at 251–52.

5

## IV.

The Plaintiff Class contends that Antero has underpaid royalties under each of its payment methods because the Form 2012 Lease unambiguously values Seneca System and Class gas when various and individual "gas products" (residue gas) and "other products" (NGL purity products) are marketable or actually capable of being sold. The Plaintiff Class argues that it only allows for deductions of costs incurred after this point, such as transportation of residue gas to distant markets, where they enhance the value of the already "marketable oil, gas or other products." The costs Antero incurs before the point of marketability (such as GTH3, CMR1, PRC2), may not be deducted from Class Member royalty payments.

Defendant disagrees with this interpretation of the Market Enhancement Clause. It posits that the natural gas stream extracted from the wells is marketable in its raw, unprocessed state. Antero asserts that it has paid royalties to the Class Members in excess of what is required by the Market Enhancement Calculation under both its payment methods. Defendant points out that the 2012 Form Lease expressly allows deductions of incurred costs to lessor royalty payments if the increased value of the improved product outweighs those costs. Thus, Defendant concludes that the gas stream is "marketable at or near the wellhead, and as such, the 2012 Form Lease allows Antero to deduct the lessor's pro rata share of any post-production costs incurred beyond the wellhead to enhance the value of the marketable hydrocarbons from the lessor's royalty payments." (ECF No. 15, at 12.) Defendant seeks a declaration that it may deduct "GTH3" and "CMR1" costs from class members royalties, as well as the "PRC2" costs.

The Court is faced with two potential questions. First is how to interpret the Market Enhancement Clause, and second, is whether Antero's value enhancements outweighed the costs required to create the added value. The Court need reach the second question only if it finds

6

Defendant's proposed interpretation, or a similar interpretation, to be controlling. As explained below, it does not.

With regard to interpretation of the Market Enhancement Clause, the Court agrees with the parties that it is not ambiguous, and that Ohio law applies to its interpretation. Defendant argues "the [Market Enhancement Clause] unambiguously permits deductions for value-enhancing costs once gas reaches marketable form, i.e. reaches a condition where it is capable of being sold." (ECF No. 85, at 11.) Plaintiffs, on the other hand, contend "the Market Enhancement Clause prohibits the deduction of gathering, compression, and processing and fractionation costs from Class members' royalty payments." (ECF No. 90, at 3.) Under Plaintiffs' interpretation of the clause, the natural gas stream taken from Class Wells does not become marketable until it is separated into residue gas and Natural Gas Liquids (NGL) purity products. This Court agrees.

Courts in Ohio interpret Oil and Gas Leases according to the normal rules of contractual construction. *Lutz v. Chesapeake Appalachia*, L.L.C., 148 Ohio St. 3d 524 (2016). Unlike many other states, Ohio has rejected both the "at-the-wellhead" and the "marketable product" default rules. Under the at-the-wellhead rule gas and oil production is always valued at the wellhead; therefore, all post-production costs incurred after the wellhead are deductible regardless of lease language. *Zehentbauer Fam. Land, LP v. Chesapeake Expl., L.L.C.*, 935 F.3d 496, 504 (6th Cir. 2019)). Under the marketable product rule "gas and oil production is valued when they become marketable products; therefore, all post-production costs incurred before marketability are non-deductible regardless of lease language. *Id*.

As the Ohio Supreme Court made clear in *Lutz v. Chesapeake Appalachia*, L.L.C., Ohio does not subscribe to either default rule and, instead the "rights and remedies of the parties to an

7

oil or gas lease must be determined by the terms of the written instrument." 148 Ohio St. 3d at 527.  "If the lease language is unambiguous, then courts should interpret the lease 'so as to carry out the intent of the parties, as that intent is evidenced by the contractual language.'" *Zehentbauer Fam. Land, LP v. Chesapeake Expl., L.L.C.*, 935 F.3d 496, 505 (6th Cir. 2019) (citing *Lutz*).

Surprisingly, there is a dearth of Sixth Circuit caselaw on the issue.  Unlike the Sixth Circuit case, *Zehentbauer Fam. Land LP v. Chesapeake Expl., LLC*, the instant contract does not contain language explicitly invoking the wellhead product rule and the defendant here does assert that marketability is a relevant inquiry.  935 F.3d 496.  This case is also distinguishable from the Sixth Circuit case of *Zehentbauer Fam. Land LP v. TotalEnergies E&P USA, Inc.*, as the contract in that case also explicitly invoked the at-the-wellhead rule.  Case No., 20-3469, 2022 WL 294081, at *1 (6th Cir. Feb. 1, 2022).  The Court, however, is not entirely without assistance.  The Fourth Circuit this year dealt with a nearly identical issue in *Corder v. Antero Resources Corporation*, 57 F.4th 384, 388 (4th Cir. 2023).

The Market Enhancement Clause at issue in *Corder* stated:

> It is agreed between the Lessor and Lessee that, notwithstanding any language herein to the contrary, all oil, gas or other proceeds accruing to the Lessor under this lease or by state law shall be without deduction, directly or indirectly, for the cost of producing, gathering, storing, separating, treating, dehydrating, compressing, processing, transporting, and marketing the oil, gas and other products produced hereunder to transform the product into marketable form; however, any such costs which result in enhancing the value of the marketable oil, gas or other products to receive a better price may be deducted from Lessor's share of production so long as they are based on Lessee's actual cost of such enhancements. However, in no event shall Lessor receive a price that is less than, or more than, the price received by Lessee.

*Corder v. Antero Resources Corp.*, 57 F.4th 384, 390 (4th Cir. 2023).

Similarly, the Market Enhancement Clause at issue in the instant action states:

8

> It is agreed between the Lessor and Lessee that, notwithstanding any language contained in A) and B) above, to the contrary, all royalties or other proceeds accruing to the Lessor under this lease or by state law shall be without deduction directly or indirectly, for the cost of producing, gathering, storing, separating, treating, dehydrating, compressing, processing, transporting, and marketing the oil, gas and other products produced hereunder to transform the product into marketable form; however, any such costs which result in enhancing the value of the marketable oil, gas or other products to receive a better price may be proportionally deducted from Lessor's share of production so long as they are based on Lessee's actual cost of such enhancements. However, in no event shall Lessor receive a price per unit that is less than the price per unit received by Lessee.

(2012 Form Lease at 6, ECF No. 85-1.)

The Fourth Circuit "[a]s a starting point," found "the term 'marketable form' is unambiguous. By its plain meaning, a product is 'marketable' when it is 'able or fit to be sold or marketed.'" *Corder*, 57 F.4th 384, 399 (4th Cir. 2023) (quoting The New Oxford American Dictionary 1038 (2d ed. 2005)). It also found the term "product" to be unambiguous. *Id*. With these definitions in hand, the court reasoned as follows:

> The first part of the Clause states that 'all oil, gas or other proceeds accruing to the Lessor . . . shall be without deduction, directly or indirectly, for the cost of producing, gathering, storing, separating, treating, dehydrating, compressing, processing, transporting, and marketing the oil, gas and other products produced hereunder to transform the product into marketable form.'
>
> In this context, the plain meaning of "product" refers to the particular form of natural gas that Antero sells. Black's Law Dictionary, for example, defines 'product' as '[s]omething that is distributed commercially for use or consumption and that is usu[ally] (1) tangible personal property, (2) the result of fabrication or processing, and (3) an item that has passed through a chain of commercial distribution before ultimate use or consumption.' Product, Black's Law Dictionary (11th ed. 2019). Thus, the Clause focuses on whether the form of gas Antero sells—and on which it must pay royalties—is marketable at the time Antero incurs a cost.

*Id*.

The *Corder* court emphasized "the nearby words, 'oil, gas, and other products'" were significant:

9

> To make sense of the sentence, "products" must modify "oil" and "gas," not just "other." That is, the Clause is referring to "oil products, gas products, and other products." The Clause is not concerned with when "gas" first reaches a marketable form, but rather when the particular gas "product" sold does. The fact that the phrase refers to plural "products" is also significant. It recognizes that Antero may produce and sell many different types of products derived from natural gas. Antero's preferred reading departs from the text because it would make only a singular product—unprocessed gas—relevant.

*Id.,* at 399–400.

*Corder* rejected Antero's preferred interpretation of the contract, concluding that it rendered part of the contract superfluous. The court stated "[t]he first part of the Clause contemplates that 'processing' costs will not be deductible in some circumstances. But if the proper reference point is the marketability of unprocessed gas, 'processing' costs will always be deductible. That creates serious tension with the rule that an interpreter must 'give meaning to every word' in a contract. *Id.*, at 400.

The court held the Market Enhancement Clause directed that "when Antero pays royalties from the sale of a particular product, it may deduct actual and reasonable costs it incurred after that product became fit for sale, as long as those costs enhanced the value of the product." *Id.*, at 401. The appellate court then sent the case back to the District Court, to determine "which products Antero sold during the relevant time frame, when those products became marketable, and whether Antero incurred the PRC2 and TRN3 costs before or after that point." *Id*.

The Court is persuaded by the Fourth Circuit's sound reasoning in *Corder* and adopts its interpretation of the contract at issue. The phrase "gas products" means residue gas, and "other products" means NGL purity products, because these are the gas products that Antero actually sold from the Seneca System. Thus, "when Antero pays royalties from the sale of a particular product, it may deduct actual and reasonable costs it incurred after *that product* became fit for

10

sale, as long as those costs enhanced the value of the product." *Corder*, 57 F.4th 384, 399 (emphasis added).

As to the remaining arguments of Defendant, the Court rejects them for the following reasons. First, Defendant's interpretation would cause Ohio too to become a de facto at-the-wellhead state. If the natural gas stream from Ohio wells is capable of being sold to some hypothetical buyer at the wellhead, then it is marketable from the second it is extracted. In this scenario, the parties' lease language would be subsumed by the at-the-wellhead rule. Any lease in which the parties attempted to invoke the marketable product rule would become an at-the-wellhead lease, as a seller could point to theoretical buyer who can always purchase from the wellhead. This result would conflict with the Ohio Supreme Court's decision in *Lutz* as it would require the Court is ignore the parties' intent and "the specific language of their lease agreement." *Lutz*, 148 Ohio St. 3d 524, 527 (2016). Further, "[h]ad Antero instead wished to make the marketability of 'unprocessed gas' the reference point, it should have said so." *Corder*, 57 F.4th 384, 399.

Second, the Court rejects Defendant's argument that the Plaintiffs' and the Fourth Circuit's preferred contractual interpretation renders much of the lease language meaningless. Defendant posits that Plaintiff's interpretation "would effectively strike out and render superfluous all specifically enumerated costs in the [Market Enhancement Clause] except for transportation." (ECF No. 85, at 14.) Defendant argues that the contract would change in the following ways:

> All royalties or other proceeds accruing to the Lessor under this lease or by state law shall be without deduction directly or indirectly, for the cost of producing, gathering storing, separating, treating, dehydrating, compressing, processing, transporting, and marketing the oil, gas and other products produced hereunder to translon the product into marketable form; however, ~~any such~~ [transportation] costs which result in enhancing the value of the marketable oil, gas or other products to

11

> receive a better price may be proportionally deducted from Lessor's share of production so long as they are based on Lessee's actual cost of such enhancements. However, in no event shall Lessor receive a price per unit that is less than the price per unit received by Lessee.

(ECF No. 85, at 15.)

> All royalties or other proceeds accruing to the Lessor under this lease or by state law shall be without deduction directly or indirectly, for the cost of producing, gathering, storing, separating, treating, dehydrating, compressing, processing, transporting, and marketing the oil, gas and other products produced hereunder to transform the product into ~~marketable form~~ [the form in which such oil., gas, or other products exist at the point of sale]; however, any such costs which result in enhancing the value of the ~~marketable~~ oil, gas or other products [in the form in which such oil, gas, or other products exist at the point of sale] to receive a better price may be proportionally deducted from Lessor's share of production so long as they are based on Lessee's actual cost of such enhancements. However, in no event shall Lessor receive a price per unit that is less than the price per unit received by Lessee.

(*Id.*, at 16.)

This Court disagrees. Under the Court's interpretation, the natural gas stream becomes marketable once it is fit for sale as one of the particular products Antero or its agents sell. Any costs incurred as a result of value enhancement after that point may be deducted from the lessors' royalty payments, not just transportation costs. Thus, the phrase "any such" is not superfluous. Further, a product need not "be at the point of sale" to be in "marketable form." It merely needs be fit for sale, meaning able to reliably enter a local transmission pipeline or a rail car, so as to make it to market.

To the contrary of Defendant's contention, it is its interpretation that would require this Court to ignore some of the parties' contractual language. As the Fourth Circuit pointed out in *Corder*, "Antero's preferred reading departs from the text because it would make only a singular product—unprocessed gas—relevant," whereas the contract refers to "products." *Corder*, 57 F.4th 384, 399–400. Defendant's interpretation would require this Court to read out the plural in order to make sense of this Clause.

Third, the Court also rejects Defendant's argument that it is entitled to summary judgment because Plaintiffs' have failed to prove their case. Defendant contends that "Plaintiff cannot carry its burden, under the correct interpretation of the MEC, of showing that (1) the gas stream produced from the wells at issue is not in marketable form, *i.e.* in a condition acceptable for sale, until following processing; or (2) the processing and fractionation costs Antero incurred and proportionally deducted from the class members' royalties did not enhance the value of marketable gas." (ECF No. 85, at 3.) However, as the Court has mentioned above, it has rejected Defendant's interpretation of the MEC. And Defendant has conceded that it did not pay royalties in the amount required under Plaintiffs' (and the Fourth Circuit's) interpretation of the contract.

Fourth, Defendant Antero attempts to distinguish the analysis from *Corder* because West Virginia is a state that follows the default marketable product rule. The *Corder* court, however, chose *not* to apply the West Virginia default marketable product rule. Instead, the court ruled that the Market Enhancement Clause unambiguously incorporated the marketable product rule. This is because the Market Enhancement Clause prohibited deductions for costs necessary to "transform the *product* into *marketable* form," only allowing the deduction of such costs if they "enhance[ed] the value of the *marketable* oil, gas or other *products* to receive a better price." These are legal terms of art, "marketable" and "product," that are incorporated into the Market Enhancement Clause, which does not include the phrase "at the well."

For these reasons, the 2012 Form Lease prohibited Antero from deducting, directly and indirectly, processing and fractionation costs from Plaintiffs' royalty payments. As Defendant concedes that it has made these deductions, it is indisputably in breach of its lease.

13

## V.

For the foregoing reasons, the Court **GRANTS** Plaintiffs' Motion for Partial Summary Judgment (ECF No. 88) and **DENIES** Defendant's Motion for Summary Judgment (ECF No. 85).  The issue of damages remains unresolved and will be tried to a jury.  Trial is currently set for September 18, 2023, to determine class-wide damages.  This case is to remain open.

    **IT IS SO ORDERED.**

**8/4/2023**                                                                            **s/Edmund A. Sargus, Jr.**
**DATE**                                                                            **EDMUND A. SARGUS, JR.**
                                                                               **UNITED STATES DISTRICT JUDGE**